The issue in this case is whether an ankle monitor that starts beeping during jury selection violates the presumption of innocence. How do you know that the jury actually heard that, number one, and knew that in fact it was an ankle monitor? How do you know that? Well, there are several reasons. One, when Mr. Bernstein, the trial lawyer, objected at sidebar, he said, you know, it started beeping, the jury is watching me. It heard it, and the jury is watching me fiddle with it. And here we have... Wait, so there's evidence in the record indicating that he said that the jury is seeing him move around the ankle monitor? Right, and this is important. You know, trial lawyers, you know, sometimes they'll pat their, you know, client on the back or something like that. But in this case, he said, the jury is watching me fiddle with it. So we have a male attorney leaning down to fiddle with his female client's ankle. So that's one thing. The judge also said, I heard it too. And then here's the other thing. Now, the judge did say he didn't think anybody would know what it was. However, when they finally took a break, sent the jury out to decide, you know, that they're going to cut it off, the judge says, and this is on 2 ER 123, the judge says, let's do this. Ladies and gentlemen, we're going to do some work and see if we can make this device work better. We're going to take a short break and, you know, so on, then he says, and we'll be bringing you back as soon as we address this technical issue. So I don't think there's any question that the jury was aware of this beeping and what it was. And I think that that's, and it's particularly, you know, when you have the lawyer leaning down and fiddling with his client's ankle. The other thing is, is that I think it's very naive to think that the general public, the jury would not know what an ankle monitor was. It's very, you know, everybody watches Netflix. I mean, you know, it's very, very common. And they're notorious for malfunctioning. So how was your client prejudiced by the beeping, assuming that the jury heard it? Sure. Well, if the court finds that it is a constitutional claim and that it does violate the presumption of innocence, then the prosecution has the burden to prove that it was harmless beyond a reasonable doubt. But here we have the fact that, first of all, she was acquitted of the distribution count. And in terms of the. . . That does not count against you, though. That does not show that the jury is picking and choosing evidence and looking at it, weighing it very carefully. I disagree. And here's why. The informant who testified in this case, he did not help the government. He did not say anything about her. He. . . The only evidence that they have when the informant came and she asked him, do you need crap? And she said, you know, I don't think there's any fentanyl or something in here. But this is clearly one addict speaking to another addict. And Ms. Wiley, we're not going to sugarcoat it. She has a terrible, terrible drug problem. But there was nothing to show that she wasn't present when the informant and the code of. . . Yes, and the sufficiency of the evidence. But how. . . I want to know how you were prejudiced, how your client was prejudiced by the. . . Right. Well, even if you don't agree that it was insufficient, it was clearly weak. And so we have the jury. . . It is, you know, if this ankle monitor hadn't been beeping and hadn't this big ruckus of having to send out the jury because of this device malfunctioning, we have the jury thinking this woman has to be restrained. She's a bad woman somehow. No, no, no. Ankle monitor is not about restraint. It's about finding out where she is. But it is still a restraint. It restrains her movement. How? Because, you know, when the judge told her she was going to have to wear this ankle monitor, it goes, if you go somewhere that you're not supposed to be, we're going to find out about that and it's going to, you know, all these bells and whistles are going to go off. It's definitely a restraint. And I think the important thing is it's different than a restraint from a shackle, right? A shackle is about this person is dangerous, and if you don't shackle him, he's going to attack someone. Right. I have two different responses. Is this a geo-like fencing thing? Like, you know, you're not supposed to leave the state. That's just about attending court proceedings. It's not about safety. Yes, but a defendant who needs to have an ankle monitor to make sure that she shows up in court singles her out as some kind of a bad person. She has a defect in her personality because she's not going to show up in court, or it also shows that she's in some kind of custody. Where is that coming from? Is there evidence of this? Well, I don't understand what you mean by evidence. Well, it's interesting, in front that you're drawing that, if someone is wearing an ankle monitor, a juror would consider that person a bad person. I just don't know where that's from. Well, I think everybody, seriously, I think the general public knows that if somebody is wearing an ankle monitor, it's because they are a criminal, because the court has imposed restrictions on their behavior that is different from the public at large. And I think this is another thing. You know, Deck versus Missouri, which, you know, says you can't have these visible shackles if they're unjustified and so on. We have to keep up with the times. You know, we go back to Wiley versus California, where the U.S. Supreme Court said, well, let me go back, California Supreme Court said. You're analyzing this under Deck, and, you know, some argue that it's not really a shackling case, that maybe it falls somewhere between a shackling case and a prison case under Estelle. Why isn't this somewhere sort of in between that, you know, wearing a prison jumpsuit going into court, going into trial, would be, you know, similarly prejudicial? I mean, why isn't this closer or somewhere maybe in the middle between sort of Estelle and Deck and those kinds of. Well, even if it's somewhat in between, it still violates the presumption of innocence. Let me explain. The U.S. Supreme Court said, you know, we have to keep up with advances in technology. And if you go to Wiley versus California, where the California Supreme Court held that searching a cell phone is a search incident to a lawful arrest. And the U.S. Supreme Court, in an unanimous decision, said, uh-uh. You know, this technology did not exist back when we decided to time out, you know, some 30, some 40 years before. And this is important. Counsel, if I could just jump in real quick. There are a series of cases where a juror sees someone in handcuffs. And the Ninth Circuit has said in those cases it's not reversible error. That's actually seeing someone in handcuffs. These were not handcuffs. These were not restraints. So tell us why, if the handcuff cases you don't automatically win, why should you win in this case? Well, I think the handcuff cases, the Ninth Circuit has held it is not per se reversible. And I would agree with that. But most of those cases are where they saw the defendant in the hallway with handcuffs or something like that or whatever. But in this particular case, you know, we have a young female with this, you know, and you have to stop the court and send the jury out and take care of it. It draws an enormous amount of attention to this ankle monitor. And that, I think, sets it apart from, you know, just having to see, you know, they glanced at the handcuffs, it was no big deal. I think it's a much bigger deal than seeing handcuffs, frankly. I think I'm, am I out of time? You have 44 seconds. Go ahead. I have a question, though. The handcuff case, if you're indicating that those are cases where they may have seen the individual in the hallway, is there something different than seeing a person in a trial have to wear an ankle monitor in the trial in front of the jury? Is there something different about that? Yes, I think it is. Because, first of all, the ankle monitor is to make sure that, you know, she doesn't go where she's not supposed to and that she shows up in court. She was in court. I mean, we have a young female, you know, in court with all this bells and, you know, beeping going off. Her lawyer is struggling and, you know, fiddling, as he said, with her ankle in front of the jury. And then the judge stops the proceedings and sends everybody out and says, we have to take care of this. And, you know, that's an unusual situation. And it is, so what's the jury to think? It's unusual, but is it prejudicial? That's the question. Well, I think it's very prejudicial, given the fact that the evidence of conspiracy was very weak. And that's the reason why she was prejudiced, and that's why this court should reverse. I'll give you your overtime. I'll give you a minute on rebuttal. Thank you. Good morning, Your Honors. And may it please the Court. Carly Palmer on behalf of the United States. This court should decline the defense's invitation to create a circuit split by extending deck to ankle monitors, especially because this court has already found that shackles or handcuffs bring in different implications than other devices, and because this was a brief and inadvertent exposure. I'd like to start by correcting the record, which is that the district court here never talked to the jury about the ankle monitor. The conversation that defense counsel mentioned had to do with a headset that a juror who was hard of hearing needed to use in order to hear the judge. So this judge never talked to the jury about the ankle monitor or the beeping. That's what makes this case different. We have to assume that the jury both heard the beeping and also knew that that beeping was an ankle monitor, correct? Yes, Your Honor. And the court here said that they don't know where that's coming from. That's not implausible. That's not illogical. That has a basis in the record. This is a beeping. This is a low battery alarm. So it's a beep. We hear beeps everywhere. Cell phones, laptops. If you've been in the district courthouse in L.A., it's fired up. There are monitors everywhere. There's a podium that goes up and down with the push of a button. Many things that could beep. As for the defense attorney's fumbling beneath or behind counsel table, people keep backpacks, people keep briefcases, people keep lots of things that could contain those devices. Even if a juror saw the defense attorney fiddling with his client's ankle, people wear medical devices. I have a colleague whose Apple Watch beeped during trial because her heart rate got high when she was nervous. Things beep everywhere. So there's nothing illogical or implausible about the district court's conclusion that even if the jurors heard that beeping, they didn't know where it was coming from. And so there's no proof here of actual prejudice. There's no polling. So we do have to make an assumption that the jury knew that, correct? In order to reach the issue, we would have to make that assumption, correct? Yes, Your Honor. And I would argue that even that isn't enough because death is based on visibility of the devices. So if you look at death, if you look at Holbrook, they talk about devices being visible over and over again because when someone is in visible shuffles, that implicates those concerns that DEC talks about. It implicates this person's in custody. They're a bad person who needs to be separated. It potentially interferes with their access to counsel. That's not implicated here. And it hurts the decorum of a judicial proceeding if we don't think a defendant is being treated respectfully. That's not in play here. So because death isn't in play here, you know, I would argue that not only do we have the Tenth Circuit and Higgins, we have the Sixth Circuit, McCain, White, but we also have this court's findings in Ward and Walker that indicate that death shouldn't apply here. Why isn't this more of an Estelle situation? Why isn't it more of a prison guard? That, I mean, again, I think it's fair to say that the community at large, let's assume, let's just make that jump. Let's make that factual jump that the jury heard. We don't have that necessarily on the record, but let's assume that it did, that they heard and knew that, in fact, Elizabeth McElmurray told me why this isn't equally as prejudicial for them to see this individual in an aquamonitor during a trial. No implication of custody, Your Honor. So the concern when we see someone in shackles, when we see someone in prison guard, this person's in pretrial custody because they've been found dangerous. You know, under the Bail Reform Act, there was no set of conditions that this person could be out in the public and the public wouldn't be in danger. Does it have no implication of any concerns of, to the public, someone wearing an aquamonitor? Very limited. This is someone who may not show up for court. This is someone who may not show up for court, and that's not relevant to a case. Perhaps if this case involves some issue of flight, some allegation of flight, you could argue that, well, if they knew it was an aquamonitor, they thought she could be subject to flight, she's more likely to flee, the defendant fled the scene. There's no channel cause of inferences here. And it's certainly not as prejudicial as being a criminal defendant in a case, right? I think that an aquamonitor, there are many cases in which an aquamonitor may go off where someone's not necessarily going to trial in a case where a drug trafficking conspiracy. So to the extent there's any flight prejudice here, it's not the same as being a criminal defendant. And it's certainly not the same as in Wharton where some, you know, jurors saw the defendant in handcuffs just outside the courtroom, and this court found that there was no inherent prejudice there because it was a brief and inadvertent exposure. And those kinds of brief and inadvertent exposures do not require reversal. That's what this court found in Wharton and Bernal and Alano. I also want to point out the facts here are actually better for the government than they were for the White case in the Sixth Circuit. If you look at the district court opinion in White, that alarm started screaming, call your officer, call your officer, call your officer, and the judge had to quickly stop trial and get the jury out of the courtroom. Here all we have is a little battery beep. It's being addressed quietly at sidebar. The judge is handling it efficiently. He's handling it quietly. He's making sure that probation is notified that they're going to turn this alarm off so if they don't cut the alarm and probation officers come in and disrupt things. He times the cutting of the aquamonitor when they're dealing with that technical difficulty with the headset for the juror who's hard of hearing. Those cases are instances of handcuffs being seen outside of the court, correct? Yes, Your Honor, those are. Not inside? Not inside, but I think what this court said in Walker about the sliding scale of not all restraints are created equal. I think that really applies here. So the greater the intensity of the shackling and the teens' visibility to the jurors, we keep coming back to visibility, the greater the extent of the prejudice. And so in that case, that was a leg raise that was underneath the pants. The jurors knew about it in the courtroom. So Walker was actually in the courtroom case. They knew about it. They saw it when the defendant was walking to and from the stand. And even in that case, this court found that it was only one part of the trial. His hands were unencumbered. And so it didn't have that same degree of prejudice. It was less obtrusive and restrictive than the shackles in DEC or the gag in Illinois or the four uniformed officers in Holbrook. One of the things we have to look at is sort of the interference between the accused and their attorney in here. There's several instances in the record that talk about that interference, isn't there? I don't believe so. If Your Honor would let me know what he's referring to. Well, I mean, the fact that they have to not watch what's going on during the middle of a trial. Go underneath a desk, fiddle with whatever device they're dealing with, get up, having to have communications with their client about some device that they're forced to wear during a trial. Doesn't that affect the ability to defend? Instead of that attorney focusing on the thing that they're there to do, which is, in fact, defend this individual, now they're having to focus on this. Isn't that the interference that case law talks about? No, Your Honor, because that's the kind of multitasking, quite frankly, that attorneys do in trials all the time is listen to what jurors are saying, talk to your client, listen to the judge, take notes. There's nothing here that's unusual. And this is only one hour in the course of a three-day trial, so this is a very small period. There's nothing in the record indicating that the defense attorney wasn't able to do his job. Despite raising these concerns at the side, he doesn't ask the court to strike the panel. He doesn't move for a mistrial. He doesn't ask the court to delay jury selection so that we can deal with the monitor. That's why we have a plain error standard here is all the things he didn't do. But they also indicate that this wasn't an out-of-hand situation that really restricted access. That was my question. The government's arguing for plain error because he didn't specifically ask for a mistrial, but clearly he was saying something was wrong. So wasn't that enough to raise the attention to the court to then, you know, figure out what the proper remedy is if there was an issue? Because the defense attorney never gave the district court an opportunity to correct an alleged error. He said there's this beeping going on. The court proposed a series of solutions, and he said thank you, Your Honor, and they went on. He never objected to the court's proposed solutions, never proposed others, never moved to strike the panel, never moved for a mistrial. He never did anything that let the district court fix the alleged problem of the district court's response. Assuming that the district court said, yes, I heard that, and that's a due process violation, and then wouldn't the district court have a responsibility to remedy that in some way? The problem here is the defense counsel brought it to the district court's attention, but the district court then found it not to be prejudicial or not a violation. But if the district court went the other way, then it clearly would have been preserved. So I just wonder why maybe we should apply plain error here. So I think it's all the things that the defense attorney didn't do. But even if this court were to apply an abuse of discretion standard, that would more than, I think, save this case. And if you look at this court's decision in Corbin, that balancing of security issues and efficiency issues, that we've got a jury waiting, we've got to get this going, I want to make sure the defendant gets their choice of jurors, with these indicia, in essence, that's exactly the kind of thing where we want to defer to a district court who is managing their courtroom. And under an abuse of discretion standard, here there was no abuse of discretion. This was one of a range of reasonable actions that the district court could have taken. So this court should be doing exactly what the court did in Holbrook and not asking is there some better way the court should handle this, but rather is what the court did so inherently unfair that the defendant didn't get a fair trial. So your position first is don't get to the issue because the jury never knew that it wasn't that bad of a monitor, correct? Yes, Your Honor. Thank you. Thank you. Thank you. Counsel, you're out of time. We'll give you one minute. Well, in terms of the defense attorney, before the trial started, the defense attorney said this is beeping and she is prejudiced, and the judge told the FBI agent to see what he could do about removing it. So it was all understood that it needed to be removed. And in terms of when we get back into the trial when the jury selection is going on and the defense attorney is fiddling with him and he objects and he goes to sidebar. Remember, this sidebar was attended by the FBI agent, you know. I mean, so why is an agent as well as. . . No, but I'm saying in terms of the. . . I'm not objecting that the FBI agent is saying. . . I'm saying, look, the FBI agent went to sidebar with the U.S. attorney. The jury is watching this. You know, something is going on. And then when the judge announces to the jury, we're going to take a break to fix this device. And then it was fixed. And then for the rest of the time there's no more. . . Absolutely not. Okay. That's not what I'm saying. You're just saying that it contributes to the idea of being a bad person. Exactly. That's exactly what I'm saying. Anyway, thank you. Thank you, counsel. This case will be submitted.
judges: OWENS, BUMATAY, MENDOZA